

600 MASSACHUSETTS AVE., NW   WASHINGTON, DC 20001
T 202.344.4000   F 202.344.8300   www.Venable.com

December 29, 2020

J. Douglas Baldridge

**T 202.344.4703**
**F 202.344.8300**
JBaldridge@Venable.com

*<u>Via Electronic Mail and Federal Express</u>*
Jared L. Cherry
Phillips Winchester
4001 S 700 E. Suite 500
Salt Lake City, Utah 84107
jlc@phillipswinchester.com

    Re:    *Response to Your December 18, 2020 Letter*

Dear Mr. Cherry:

As you know, Venable LLP represents Ms. Taylor Swift, TAS Rights Management, LLC and Taylor Nation LLC (collectively, the "Swift Parties"). I am writing in response to your December 18, 2020 letter alleging baseless claims of trademark infringement associated with the release of Ms. Swift's most recent album. Put simply, the Swift Parties have not infringed your client's trademark, and it is inconceivable that there is any likelihood of confusion between your client's theme park and related products and Ms. Swift's music and related products.

Your letter states that the Swift Parties' "use of the EVERMORE trademark infringes on Evermore's trademark rights and has resulted in actual confusion." We disagree. In the Tenth Circuit, six factors are relevant to determining a likelihood of confusion. Those factors are: (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in using the mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the mark. *Sally Beauty Co. v. Beautyco, Inc*., 304 F.3d 964, 972 (10th Cir. 2002) (citing *King of the Mountain Sports, Inc. v. Chrysler Corp*., 185 F.3d 1084, 1089-90 (10th Cir. 1999). An examination of these factors demonstrates the unfounded nature of your claim.

First, the obvious dissimilarity of the marks as to the appearance, sound, connotation, and commercial impression eliminates any potential consumer confusion. Your client's alleged trademark "EVERMORE" is clearly dissimilar from "TAYLOR SWIFT EVERMORE ALBUM."[1] It is a well understood principle that additions or deletions to marks are sufficient to

---

[1]    While Ms. Swift's album is called "evermore," as your letter acknowledges, the trademark applications are for TAYLOR SWIFT EVERMORE ALBUM.  This is because to the extent the Swift



December 29, 2020
Page 2

avoid a likelihood of confusion if the marks in their entireties convey significantly different commercial impressions. *See, e.g., Citigroup Inc. v. Capital City Bank Group, Inc.*, 637 F.3d 1344, 1356, 98 USPQ2d 1253, 1261 (Fed. Cir. 2011); *Safer, Inc. v. OMS Invs., Inc.*, 94 USPQ2d 1031, 1044-45 (TTAB 2010). Your client is well aware of this principle, as it has previously argued it to the U.S. Patent and Trademark Office. In fact, when arguing that EVERMORE could peacefully co-exist with DR. EVERMOR—the owner of another trademark and the operator of a similar park—for identical goods and services, your client argued:

> [T]he title "Dr." is applied to a person, thus communicating to the public that "Dr. Evermor" refers to an individual. This fact is confirmed by the "Name/Portrait Statement" included in the Cited Mark. Specifically, the Cited Mark indicates that "The likeness (or, "portrait") in the mark identifies a living individual whose consent is of record." In this particular context, the public would correctly assume that Dr. Evermor is the proprietor of the goods bearing his name. For at least this reason, the Applicant respectfully asserts that there is no likelihood of confusion between the Cited Mark and the Applicant's mark.[2]

Here, the addition of TAYLOR SWIFT . . . ALBUM clearly distinguishes the Swift Parties' products and services from any products or services sold by your client, even more so than the ambiguous word "DR." did in the goods and services offered under the DR. EVERMOR mark—a mark your client asserted could peacefully co-exist with its EVERMORE mark in USPTO submissions. Your client cannot possibly reconcile a belief of no likelihood of confusion between EVERMORE and DR. EVERMOR used on identical goods and services, with the assertion that there is a likelihood of confusion between EVERMORE and TAYLOR SWIFT EVERMORE ALBUM on entirely different goods and services. Further, in addition to differences between the marks themselves and the goods and services they cover, the Swift Parties' promotion of Ms. Swift's new album conveys a significantly different commercial impression from that of your client's amusement park. Among other things, the Swift Parties have consistently stylized references to the new album in a way that is entirely distinct from your client's branding, including through their use of the all-lowercase lettering and font that has become widely associated with Ms. Swift's projects throughout 2020.[3] Moreover, the Swift Parties consistently use the name

---

Parties intend to use a trademark on merchandise, they intend to use the trademark TAYLOR SWIFT EVERMORE ALBUM.

[2]      *See* Office Action Responses dated March 10, 2014 submitted in connection with Serial Numbers 85933153 and 85933243 (attached as Exhibit A), among other similar filings.

[3]      Indeed, a part of the Swift Parties' brand identity in recent years has been the use of specific fonts, color palettes, and other stylized features to identify each of Ms. Swift's albums or "eras," including on all related album merchandise and marketing materials. This era-specific branding enables consumers to quickly associate the content with Ms. Swift's projects, and not those of a third party.



December 29, 2020
Page 3

"Taylor Swift" and/or images of Taylor Swift in close proximity to any promotion of the album and related merchandise. Whether in a vacuum or in the marketplace, these marks are plainly distinct.

       Second, you have not identified any evidence of <u>actual</u> confusion, likely because there is none. You make the conclusory statement that "Evermore's web traffic and digital marketing have been negatively impacted since your adoption of the Evermore trademark" and claim that "[d]uring the week of December 6-12, 2020, [your client's] website traffic experienced a dramatic departure from typical levels." As a preliminary matter, a change in website traffic does not equate to trademark confusion. Furthermore, even if it did, any dramatic departure from typical levels that occurred from December 6 – December 9 are in no way attributable to the Swift Parties because Ms. Swift's album name was not announced until December 10. Your attempt to fully impute an alleged decline in email traffic to Ms. Swift's new album is similarly misguided given the reality of the industry-wide impacts COVID-19 has had on theme parks,[4] particularly in winter months as temperatures decline and as case counts are soaring across the country. Lastly, and perhaps most importantly, your client's social media posts belie this claim as they have intentionally traded off and taken advantage of this alleged attention in a transparent attempt to try to create an association between your client and ours.





---

[4]      Indeed, internet traffic for theme parks is down across the entire industry, a reality no doubt attributable to the ongoing global pandemic. As your client's Facebook page makes clear: "The arts have been hit hard by COVID-19 and Evermore is no exception." Evermore Park Facebook Post (August 25, 2020). The difficulties theme parks have experienced during COVID-19 predate, and obviously have nothing to do with, the release of Ms. Swift's new album.



December 29, 2020
Page 4



If anything, your client's website traffic has actually increased as a result of the release of Ms. Swift's recent album which, in turn, could only serve to *enhance* your client's mark. Indeed, as your client writes "everyone online is talking about us."[5]

Third, the products at issue and marketing methods could not be more dissimilar—further weighing against a finding of a likelihood of confusion. Insomuch as your letter did not provide any concrete evidence of your client's trademark rights, our analysis will focus first on the USPTO records, then on purported common law rights. With respect to the USPTO records, your client's registrations currently consist of clothing, as well as entertainment in the nature of acting services

---

[5]     To the extent you have any legitimate, admissible evidence of actual confusion, we invite you to share it with us. Additionally, we are aware of your client's Facebook post stating (in response to the following post: "So  @EvermorePark  I  see  a  marketing  opportunity…..right?  @taylorswift13 #evermorealbum *ts* #TaylorSwift *ts*") "We reached out… and haven't heard anything yet." Our clients have no record of any such contact. Once again, an attempt by your client to try to market with the Swift Parties (and publicly informing consumers of this intent) belies the claim that your client is damaged or that there is any likelihood of confusion.

# VENABLE LLP

December 29, 2020
Page 5

and amusement park services. Because your client has argued to the USPTO that these goods and services would be offered at a park located in Lindon, Utah (see Exhibit 1) and nothing in your letter contradicts this, we assume the same is true. The Swift Parties' products and services bearing the TAYLOR SWIFT EVERMORE ALBUM mark do not, and will not, consist of those goods and services offered exclusively at a park. As such, the products at issue and marketing methods for them, with respect to the USPTO records, are different.

With respect to any purported common law rights your client may have in EVERMORE on additional goods, your letter claims that "Evermore already offers goods bearing the EVERMORE trademark, as shown in the following screen capture," however, you have provided no other evidence to support your client's purported trademark rights in these items. In fact, from what we can determine on the screenshot, it is unclear what trademark rights, if any, your client has in the word EVERMORE for these products as the word EVERMORE only appears on, at most, two items—and one such use appears to be ornamental in nature rather than as a trademark to indicate the source of its clothing or to identify and distinguish its clothing from others.

Your letter points to "in park exclusive items" including small dragon eggs, guild patches, and a small dragon mount and claims that items available on Ms. Swift's website are similar. They are not. The "in park exclusive items" are not available for purchase online; they are only allegedly available to purchase "exclusively" at your client's theme park[6]—a distribution channel that could not be more disassociated with my client's mark. The "merch" available on Ms. Swift's website related to her new album, on the other hand, is only available for purchase online—on a website that is clearly branded with Ms. Swift's name, likeness and/or image. As such, there is simply no overlap in the marketing methods and channels of trade between our clients' respective goods and services, and thus no potential for lost sales or actual confusion between them. Moreover, contrary to the assertion in your letter, the "merch" on Ms. Swift's website only contains pictures of Ms. Swift or album lyrics and is not identified as an "evermore" collection. Even the URL where this merch is available makes no mention of "evermore": https://store.taylorswift.com/?utm_campaign =nav&utm_medium=referral&utm_source=taylorswift.com.[7]  And,  importantly,  Ms.  Swift's

---

[6]     To be clear, you have presented zero evidence that these "in park" items are actively being sold. As we are sure you understand, a screenshot of product images available exclusively at a physical location is not sufficient to show use of a mark, either at the USPTO or to establish trademark rights—this is especially true when the images do not show use of the mark, any information about how or where to purchase the items, etc.

[7]     As to the URLs containing links to Ms. Swift's store with "evermore" included in the web address, these pages were merely for backend inventory and were never intended to be live or publicly available. They were only available for a short period of time due to a mistake by one of the vendors in charge of maintaining the website. They are no longer publicly available in connection with the word "evermore."



December 29, 2020
Page 6

website does not sell small dragon eggs, guild patches, or small dragon mounts, and nothing could be remotely characterized as such.

Fourth, consumers seeking to purchase merchandise related to Ms. Swift are sophisticated and will take extreme care to ensure that items do, in fact, relate to her and not your client's theme park. As you may know, Ms. Swift has a large and extremely dedicated fan base. Ms. Swift is also highly recognizable. The commercial value of an item related to Ms. Swift is distinct and easily recognizable. You can rest assured that consumers seeking merchandise related to Ms. Swift, rather than your client's theme park, will ensure that they select the correct items.

Fifth, with respect to the strength of your client's mark, the prevalence of other uses of EVERMORE trademarks both in the marketplace and on the registry further supports the fact that customers are able to distinguish between your client's products and those offered by the Swift Parties. Indeed, as already discussed above and as your client is well aware, there exists another business in operation called Dr. Evermor's Sculpture Park. *See* worldofevermor.com; forevertron.myhopify.com/pages/about-us. Not only does it appear that your client does not have any trademark issues with Dr. Evermor—the operator of another "park"—it has affirmatively argued that the marks can peacefully co-exist. *See supra* and Exhibit 1. Even more telling, another business—Evermore Medieval Festival (Evermore Faire)—operates a park-like medieval/magical experience in the same niche market as your client. *See* https://www.evermorefaire.com/. The presence of at least three park-like businesses operating with virtually identical Evermore names speaks to the weakness of your client's EVERMORE mark. To put it another way, if your client has not been damaged by third parties operating identical businesses under identical trademarks, it is implausible that your client would be damaged by a third party operating a completely different business under a different trademark—as is the case here.

\*\*\*

Whether there is a likelihood of confusion between two marks can often be determined by asking the following question: would a consumer who sees products being offered under a new trademark believe they are associated with a senior trademark holder? Here, the answer is assuredly, no. Simply put, our clients are using distinguishable marks, operate in separate industries, and are competing for different consumers. Given the foregoing, we do not believe there is any likelihood of confusion between these marks, and you have not presented any evidence to the contrary. As explained throughout, your claims of trademark infringement are baseless, and the Swift Parties decline your demand that they "cease and desist from [the] use of the EVERMORE trademark."



December 29, 2020
Page 7

     We trust that this resolves any concerns your client may have had, and we believe this matter is resolved. Nevertheless, if you want to discuss this matter further, please feel free to contact me at the above Washington, D.C. telephone number.  The Swift Parties reserve all rights.


     Sincerely,

J. Douglas Baldridge, Esq.


cc: Rebecca A. Liebowitz, Esq.

# EXHIBIT A

PTO Form 1957 (Rev 9/2005)
OMB No, 0651-0050 (Exp, 07/31/2017)

# Response to Office Action

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 85933153 |
| **LAW OFFICE ASSIGNED** | LAW OFFICE 101 |
| **MARK SECTION** | |
| MARK | http://tsdr.uspto.gov/img/85933153/large |
| LITERAL ELEMENT | EVERMORE |
| STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| MARK STATEMENT | The mark consists of standard characters, without claim to any particular font style, size or color. |
| **ARGUMENT(S)** | |

### RESPONSE TO OFFICE ACTION

This is in response to the Office Action dated September 9, 2013, which was received in connection with the above-identified application.  The Office Action rejects the application pursuant to Section 2(d) of the Trademark Act on the grounds that a likelihood of confusion exists between the Applicant's  mark and trademark serial no. 85/466,723 for the mark "DR. EVERMOR" (the "Cited Application").

Reconsideration and allowance of the application is hereby respectfully requested because, as set forth in detail below, Applicant's mark is not likely to cause confusion or mistake with the Cited Application.


### Remarks

In *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357 (C.C.P.A. 1973), the Court of Customs and Patent Appeals discussed the factors relevant to a determination of likelihood of confusion.  In ex parte examination, the issue of likelihood of confusion typically revolves around the similarity or dissimilarity of the marks and the relatedness of the goods or services.  The other factors listed in *du Pont* may be considered if relevant evidence is contained in the record. *See In re Majestic Distilling Co.*, 315 F.3d 1311, 1315 (Fed. Cir. 2003) ("Not all of the *DuPont* factors may be relevant or of equal weight in a given case, and 'any one of the factors may control a particular case,'"  *quoting In re Dixie Restaurants, Inc.*, 105 F.3d 1405, 1406-07 (Fed. Cir. 1997)); *In re National Novice Hockey League, Inc.*, 222 USPQ 638, 640 (TTAB 1984).  In an ex parte case, the following factors are usually the most relevant:

1. The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.

2. The relatedness of the goods or services as described in an application or registration or in connection with which a prior mark is in use.

3. The similarity or dissimilarity of established, likely-to-continue trade channels.

4. The conditions under which and buyers to whom sales are made, i.e. "impulse" vs. careful, sophisticated purchasing.

The Applicant asserts that there is no likelihood of confusion between the Applicant's Mark and the Cited Application for the following reasons.

### I.   There is No Likelihood of Confusion When the Marks are considered in Their Entirety.

The Cited Mark and the Applicant's marks must be considered in their entireties when determining whether there is likelihood of confusion and the likelihood of confusion cannot be predicated on dissection of a mark; that is, on only part of a mark.  *See In re National Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985).  The Court of Appeals for the Federal Circuit has provided the following guidance with regard to determining and articulating likelihood of confusion:

> The basic principle in determining confusion between marks is that marks must be compared <u>in their entireties</u> and must be considered in connection with the particular goods or services for which they are used (citations omitted). It follows from that principle that likelihood of confusion cannot be predicated on dissection of a mark, that is, on only part of a mark (footnote omitted).

*In re National Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985) (emphasis added); *see* TMEP § 1207.01.

Additionally, the question in a likelihood of confusion analysis is not whether people will confuse the marks, but whether the marks will confuse people into believing that the goods they identify come from the same source.  *In re West Point-Pepperell, Inc.*, 468 F.2d 200, 175 USPQ 558 (C.C.P.A. 1972).  For that reason, the test of likelihood of confusion is not whether the marks can be distinguished when subjected to a side-by-side comparison.  The question is whether the marks create the same overall impression.  *See Recot, Inc. v. M.C. Becton*, 214 F.2d 1322, 54 USPQ2d 1894, 1890 (Fed. Cir. 2000); *Visual Information Inst., Inc. v. Vicon Indus. Inc.*, 209 USPQ 179 (TTAB 1980).  The focus is on the recollection of the average purchaser who normally retains a general rather than specific impression of trademarks.  *See Chemetron Corp. v. Morris Coupling & Clamp Co.*, 203 USPQ 537 (TTAB 1979); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975); TMEP §1207.01(b).  The analysis of these issues brings the factors listed above into consideration.

The title "Dr." in the Cited Mark provides a distinct commercial impression for several reasons.   First, the addition of the honorific title "Dr." changes the commercial impression of the Cited Mark.   The title Dr. has been associated with societal status and education from time immemorial.  TMEP § 1207.01(b)(iii) provides that "[a]dditions or deletions to marks may be sufficient to avoid a likelihood of confusion if: (1) the marks in their entireties convey significantly different commercial impression...."  The Applicant respectfully asserts that the addition of the honorific title "Dr." is more than a mere "peripheral difference[]" between the Applicant's Mark and the Cited Mark.   *C.f.* TMEP § 1207.01(b)(iii) ("[I]f the dominant portion of both marks is the same, then the marks may be confusingly similar notwithstanding *peripheral differences*.")

The only consideration given in the Office Action to the honorific title "Dr." in the cited mark is the assertion that "the deletion of the DR. portion from registrant's mark is not sufficient to avoid confusion. The mere deletion of wording from a registered mark may not be sufficient to overcome a likelihood of confusion."   Office Action at page 2.  The foregoing is merely a conclusion—not an analysis supporting the assertion that the consuming public would deem the honorific title "Dr." to constitute merely a "peripheral difference[]."

Second, the title "Dr." is applied to a person, thus communicating to the public that "Dr. Evermor" refers to an individual. This fact is confirmed by the "Name/Portrait Statement" included in the Cited Mark.   Specifically, the Cited Mark indicates that "The likeness (or, "portrait") in the mark identifies a living individual whose consent is of record."   In this particular context, the public would correctly assume that Dr. Evermor is the proprietor of the goods bearing his name.  For at least this reason, the Applicant respectfully asserts that there is no likelihood of confusion between the Cited Mark and the Applicant's mark, and the rejection entered under § 2(d) should be withdrawn.

### II.   The Channels of Trade Associated with the Applicant's Mark and the Cited Registration are Distinct.

The TMEP indicates that it is appropriate to consider the "similarity or dissimilarity of established, likely-to-continue trade channels."  TMEP §1207.01.  The specimen showing use of the DR. EVERMOR mark refers to the FOREVERTRON sculpture. The website operated by "Dr. Evermor" and pages linked to by "Dr. Evermor's" site show that the Cited Mark has been used at all relevant times as follows:

> Dr. Evermor's Forevertron, built in the 1980s, is the largest scrap metal sculpture in the world, standing 50 ft. (15,2 m.) high and 120 ft. (36,5 m.) wide, and weighing 300 tons. It is housed in Dr. Evermor's Art Park on Highway 12, in the town of Sumpter, in Sauk County, Wisconsin, United States.

See Exhibit 2, at page 4.

Given that the Cited Mark has been used in connection with a scrap metal sculpture and associated "Art Park" since the 1980s, the Applicant asserts that the Cited Mark has "established, likely-to-continue trade channels…." These "established, likely-to-continue trade channels" pertain to the scrap metal garden located in the town of Sumpter, Wisconsin, where "Dr. Evermor's" one-of-a-kind sculpture is located.

The Office Action asserts that "[t]he goods would be sold in clothing stores, websites, catalogues and departments;" however, there is no evidence showing that this assertion is correct. On the contrary, the goods are likely to be distributed at the "Art Park" operated by Dr. Evermor and located in the town of Sumpter, in Sauk County, Wisconsin.

The Applicant's Mark will be used initially in connection with an amusement park located in Lindon, Utah. Attached as Exhibit 1 is a news article from the *Daily Herald*, a newspaper in Utah. Accordingly, the evidence shows that the channels of trade are likely to be distinct.

For at least this reason, the Applicant respectfully asserts that there is no likelihood of confusion between the Cited Mark and the Applicant's mark, and the rejection entered under § 2(d) should be withdrawn.

**Conclusion**

This response is believed to address all of the issues raised by the Examining Attorney. This application is now believed to be in condition for registration. In the event the Examining Attorney does not agree with the sufficiency of this Response and Amendment, Applicant respectfully requests that Applicant be given the opportunity to respond to any outstanding issues. Applicant invites the Examining attorney to address any remaining issues in a telephone conference with the undersigned.

Please note that all correspondence regarding this application should be directed to the attention of the undersigned.

## EVIDENCE SECTION

| EVIDENCE FILE NAME(S) | |
| --- | --- |
| ORIGINAL PDF FILE | evi_233058189-193614241_._2014-03-10_Exhibit_1.pdf |
| CONVERTED PDF FILE(S) (2 pages) | \\TICRS\EXPORT16\IMAGEOUT16\859\331\85933153\xml4\ROA0002.JPG |
| | \\TICRS\EXPORT16\IMAGEOUT16\859\331\85933153\xml4\ROA0003.JPG |
| ORIGINAL PDF FILE | evi_233058189-193614241_._2014-03-10_Exhibit_2_-_About_Dr_Evermor_Page.pdf |
| CONVERTED PDF FILE(S) (7 pages) | \\TICRS\EXPORT16\IMAGEOUT16\859\331\85933153\xml4\ROA0004.JPG |
| | \\TICRS\EXPORT16\IMAGEOUT16\859\331\85933153\xml4\ROA0005.JPG |
| | \\TICRS\EXPORT16\IMAGEOUT16\859\331\85933153\xml4\ROA0006.JPG |
| | \\TICRS\EXPORT16\IMAGEOUT16\859\331\85933153\xml4\ROA0007.JPG |
| | \\TICRS\EXPORT16\IMAGEOUT16\859\331\85933153\xml4\ROA0008.JPG |
| | \\TICRS\EXPORT16\IMAGEOUT16\859\331\85933153\xml4\ROA0009.JPG |
| | \\TICRS\EXPORT16\IMAGEOUT16\859\331\85933153\xml4\ROA0010.JPG |
| DESCRIPTION OF EVIDENCE FILE | News article; website pages |

## SIGNATURE SECTION

| | |
| --- | --- |
| RESPONSE SIGNATURE | /Jared L. Cherry/ |
| SIGNATORY'S NAME | Jared L. Cherry |
| SIGNATORY'S POSITION | Attorney of Record, Utah bar member |
| SIGNATORY'S PHONE NUMBER | 8019354935 |
| DATE SIGNED | |

| DATE SIGNED | 03/10/2014 |
| --- | --- |
| AUTHORIZED SIGNATORY | YES |
| **FILING INFORMATION SECTION** | |
| SUBMIT DATE | Mon Mar 10 19:47:53 EDT 2014 |
| TEAS STAMP | USPTO/ROA-XX.XX.XX.XXX-20 140310194753987261-859331 53-5002f9cbc99edcf79475ab 3ce15b6d9648b23b926b4f171 ef9bcb4944b368e58-N/A-N/A -20140310193614241566 |

PTO Form 1957 (Rev 9/2005)
OMB No, 0651-0050 (Exp, 07/31/2017)

**Response to Office Action**

## To the Commissioner for Trademarks:

Application serial no. **85933153** EVERMORE(Standard Characters, see http://tsdr.uspto.gov/img/85933153/large) has been amended as follows:

**ARGUMENT(S)**
**In response to the substantive refusal(s), please note the following:**

**RESPONSE TO OFFICE ACTION**

   This is in response to the Office Action dated September 9, 2013, which was received in connection with the above-identified application.  The Office Action rejects the application pursuant to Section 2(d) of the Trademark Act on the grounds that a likelihood of confusion exists between the Applicant's  mark and trademark serial no. 85/466,723 for the mark "DR. EVERMOR"  (the "Cited Application").

   Reconsideration and allowance of the application is hereby respectfully requested because, as set forth in detail below, Applicant's mark is not likely to cause confusion or mistake with the Cited Application.

**Remarks**

   In *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357 (C.C.P.A. 1973), the Court of Customs and Patent Appeals discussed the factors relevant to a determination of likelihood of confusion.  In ex parte examination, the issue of likelihood of confusion typically revolves around the similarity or dissimilarity of the marks and the relatedness of the goods or services.  The other factors listed in *du Pont* may be considered if relevant evidence is contained in the record. *See In re Majestic Distilling Co.*, 315 F.3d 1311, 1315 (Fed. Cir. 2003) ("Not all of the *DuPont* factors may be relevant or of equal weight in a given case, and 'any one of the factors may control a particular case,'" *quoting In re Dixie Restaurants, Inc.*, 105 F.3d 1405, 1406-07 (Fed. Cir. 1997)); *In re National Novice Hockey League, Inc.*, 222 USPQ 638, 640 (TTAB 1984).  In an ex parte case, the following factors are usually the most relevant:

1.   The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.

2.   The relatedness of the goods or services as described in an application or registration or in connection with which a prior mark is in use.

3.   The similarity or dissimilarity of established, likely-to-continue trade channels.

4.   The conditions under which and buyers to whom sales are made, i.e. "impulse" vs. careful, sophisticated purchasing.

The Applicant asserts that there is no likelihood of confusion between the Applicant's Mark and the Cited Application for the following reasons.

### I. There is No Likelihood of Confusion When the Marks are considered in Their Entirety.

The Cited Mark and the Applicant's marks must be considered in their entireties when determining whether there is likelihood of confusion and the likelihood of confusion cannot be predicated on dissection of a mark; that is, on only part of a mark. *See In re National Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985). The Court of Appeals for the Federal Circuit has provided the following guidance with regard to determining and articulating likelihood of confusion:

> The basic principle in determining confusion between marks is that marks must be compared in their entireties and must be considered in connection with the particular goods or services for which they are used (citations omitted). It follows from that principle that likelihood of confusion cannot be predicated on dissection of a mark, that is, on only part of a mark (footnote omitted).

*In re National Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985) (emphasis added); *see* TMEP § 1207.01.

Additionally, the question in a likelihood of confusion analysis is not whether people will confuse the marks, but whether the marks will confuse people into believing that the goods they identify come from the same source. *In re West Point-Pepperell, Inc.*, 468 F.2d 200, 175 USPQ 558 (C.C.P.A. 1972). For that reason, the test of likelihood of confusion is not whether the marks can be distinguished when subjected to a side-by-side comparison. The issue is whether the marks create the same overall impression. *See Recot, Inc. v. M.C. Becton*, 214 F.2d 1322, 54 USPQ2d 1894, 1890 (Fed. Cir. 2000); *Visual Information Inst., Inc. v. Vicon Indus. Inc.*, 209 USPQ 179 (TTAB 1980). The focus is on the recollection of the average purchaser who normally retains a general rather than specific impression of trademarks. *See Chemetron Corp. v. Morris Coupling & Clamp Co.*, 203 USPQ 537 (TTAB 1979); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975); TMEP §1207.01(b). The analysis of these issues brings the factors listed above into consideration.

The title "Dr." in the Cited Mark provides a distinct commercial impression for several reasons.  First, the addition of the honorific title "Dr." changes the commercial impression of the Cited Mark. The title Dr. has been associated with societal status and education from time immemorial. TMEP § 1207.01(b)(iii) provides that "[a]dditions or deletions to marks may be sufficient to avoid a likelihood of confusion if: (1) the marks in their entireties convey significantly different commercial impression…." The Applicant respectfully asserts that the addition of the honorific title "Dr." is more than a mere "peripheral difference[]" between the Applicant's Mark and the Cited Mark.  *C.f.* TMEP § 1207.01(b)(iii) ("[I]f the dominant portion of both marks is the same, then the marks may be confusingly similar notwithstanding *peripheral differences*.")

The only consideration given in the Office Action to the honorific title "Dr." in the cited mark is the assertion that "the deletion of the DR. portion from registrant's mark is not sufficient to avoid confusion. The mere deletion of wording from a registered mark may not be sufficient to overcome a likelihood of confusion." Office Action at page 2. The foregoing is merely a conclusion—not an analysis supporting the assertion that the consuming public would deem the honorific title "Dr." to constitute merely a "peripheral difference[]."

Second, the title "Dr." is applied to a person, thus communicating to the public that "Dr. Evermor" refers to an individual. This fact is confirmed by the "Name/Portrait Statement" included in the Cited Mark.  Specifically, the Cited Mark indicates that "The likeness (or, "portrait") in the mark identifies a living individual whose consent is of record."  In this particular context, the public would correctly assume that Dr. Evermor is the proprietor of the goods bearing his name. For at least this reason, the Applicant respectfully asserts that there is no likelihood of confusion between the Cited Mark and the Applicant's mark, and the rejection entered under § 2(d) should be withdrawn.

### II. The Channels of Trade Associated with the Applicant's Mark and the Cited Registration are Distinct.

The TMEP indicates that it is appropriate to consider the "similarity or dissimilarity of established, likely-to-continue trade channels."  TMEP §1207.01. The specimen showing use of the DR. EVERMOR mark refers to the FOREVERTRON sculpture. The website operated by "Dr. Evermor" and pages linked to by "Dr. Evermor's" site show that the Cited Mark has been used at all relevant times as follows:

> Dr. Evermor's Forevertron, built in the 1980s, is the largest scrap metal sculpture in the world, standing 50 ft. (15,2 m.) high and 120 ft. (36,5 m.) wide, and weighing 300 tons. It is housed in Dr. Evermor's Art Park on Highway 12, in the town

of Sumpter, in Sauk County, Wisconsin, United States.

See Exhibit 2, at page 4.

Given that the Cited Mark has been used in connection with a scrap metal sculpture and associated "Art Park" since the 1980s, the Applicant asserts that the Cited Mark has "established, likely-to-continue trade channels…."  These "established, likely-to-continue trade channels" pertain to the scrap metal garden located in the town of Sumpter, Wisconsin, where "Dr. Evermor's" one-of-a-kind sculpture is located.

The Office Action asserts that "[t]he goods would be sold in clothing stores, websites, catalogues and departments;" however, there is no evidence showing that this assertion is correct.  On the contrary, the goods are likely to be distributed at the "Art Park" operated by Dr. Evermor and located in the town of Sumpter, in Sauk County, Wisconsin.

The Applicant's Mark will be used initially in connection with an amusement park located in Lindon, Utah.   Attached as Exhibit 1 is a news article from the *Daily Herald*, a newspaper in Utah.  Accordingly, the evidence shows that the channels of trade are likely to be distinct.

For at least this reason, the Applicant respectfully asserts that there is no likelihood of confusion between the Cited Mark and the Applicant's mark, and the rejection entered under § 2(d) should be withdrawn.

**Conclusion**

This response is believed to address all of the issues raised by the Examining Attorney.  This application is now believed to be in condition for registration.  In the event the Examining Attorney does not agree with the sufficiency of this Response and Amendment, Applicant respectfully requests that Applicant be given the opportunity to respond to any outstanding issues.  Applicant invites the Examining attorney to address any remaining issues in a telephone conference with the undersigned.

Please note that all correspondence regarding this application should be directed to the attention of the undersigned.

**EVIDENCE**
Evidence in the nature of News article; website pages has been attached.
**Original PDF file:**
evi_233058189-193614241_._2014-03-10_Exhibit_1.pdf
**Converted PDF file(s)** ( 2 pages)
Evidence-1
Evidence-2
**Original PDF file:**
evi_233058189-193614241_._2014-03-10_Exhibit_2_-_About_Dr_Evermor_Page.pdf
**Converted PDF file(s)** ( 7 pages)
Evidence-1
Evidence-2
Evidence-3
Evidence-4
Evidence-5
Evidence-6
Evidence-7

**SIGNATURE(S)**
**Response Signature**
Signature: /Jared L. Cherry/     Date: 03/10/2014
Signatory's Name: Jared L. Cherry
Signatory's Position: Attorney of Record, Utah bar member

Signatory's Phone Number: 8019354935

The signatory has confirmed that he/she is an attorney who is a member in good standing of the bar of the highest court of a U.S. state, which includes the District of Columbia, Puerto Rico, and other federal territories and possessions; and he/she is currently the applicant's attorney or an associate thereof; and to the best of his/her knowledge, if prior to his/her appointment another U.S. attorney or a Canadian attorney/agent not currently associated with his/her company/firm previously represented the applicant in this matter: (1) the applicant has filed or is concurrently filing a signed revocation of or substitute power of attorney with the USPTO; (2) the USPTO has granted the request of the prior representative to

withdraw; (3) the applicant has filed a power of attorney appointing him/her in this matter; or (4) the applicant's appointed U.S. attorney or Canadian attorney/agent has filed a power of attorney appointing him/her as an associate attorney in this matter.


Serial Number: 85933153
Internet Transmission Date: Mon Mar 10 19:47:53 EDT 2014
TEAS Stamp: USPTO/ROA-XX.XX.XX.XXX-20140310194753987
261-85933153-5002f9cbc99cdcf79475ab3ce15
b6d9648b23b926b4f171ef9bcb4944b368e58-N/
A-N/A-20140310193614241566

3/10/2014                                  3. Jobs expected to be created with Evermore Park.





Quick Clicks

    

# 3. Jobs expected to be created with Evermore Park.



Patrick Kendall applies a prosthetic injury and fake blood on Jordan Colton's face at the
Haunted Cemetery at the Evermore Pumpkin Festival for a photoshoot in Lindon on Tuesday,
Oct. 29, 2013. Kendall and Colton are the makeup artist and director, respectively, for the Evermore Pumpkin
Fest in Lindon. SPENSER HEAPS

Buy Now

November 07, 2013 7:49 am

More details about a proposed theme park centered on the idea of Victorian-era England and
planned for a location in Pleasant Grove is expected to bring many jobs to the area. Evermore
Park is expected to bring retail business to surround its unique entertainment.

Copyright 2014 Daily Herald. All rights reserved. This material may not be published, broadcast, rewritten or redistributed.

3/10/2014                                    3. Jobs expected to be created with Evermore Park.

**TRENDING OFFERS AND ARTICLES**                                        ADVERTISEMENT


**Cumbersome CPAP machines or risky surgery are not the only answers to solving sleep apnea.**


**20 celebrities we didn't know were gay before they came out.**


**Side Effects: Weight Gain, Rashes, Diarrhea & More...**


**FEMA is scared that people will hoard the #1 MOST critical item in a crisis. [VIDEO]**

## Recommendations

Michael Benjamin Romney  (Daily Herald)

Michelle Obama's DNA Test Show Slave Owner as Ancestor  (Ancestry.com)

Christopher Joel Starkey  (Daily Herald)

PacSun T-shirts not indecent, legally  (Daily Herald)

## Sponsored Links

### Free WiFi Internet

freedompop.com

Just a one-time $19.99 activation. Get 500MB of free internet monthly.

3/10/2014                                                                 About Dr. Evermor

Home

Online Store

Books for Sale

Videos for Sale

Photos By Tya





Tya Kottler
608-381-0465
tya@tds.net



Find My Dream Home

What Is My Home Worth?

Help Me Relocate!

## About Dr. Evermor

Dr. Evermore currently resides at the following address:


Tom Every

Maplewood of Sauk Prairie

245 Sycamore St.

Sauk City, WI 53583

© 2014 Agent Image All rights reserved.  | Terms | Sitemap                          Design by Agent Image - Real Estate Web Site Design

http://www.worldofdrevermor.com/about.php                                                                 1/1

3/10/2014                                        In The News

http://www.roadsideamerica.com/story/2239

| ABOUT DR. EVERMOR | SCULPTURES FOR SALE | VISIT DR. EVERMOR'S PARK | IN THE NEWS | VIDEO ARCHIVE | CONTACT DR. EVERMOR |

Home

Online Store

Books for Sale

Videos for Sale

Photos By Tya





Tya Kottler
608-381-0465
tya@tds.net

**NEED ASSISTANCE?**

Find My Dream Home

What Is My Home Worth?

Help Me Relocate!

**Roadside America**
**'American Pickers' Like Every's Hidden Gems**
**Forevertron - Wikipedia**
**PBS - Off the Map**

**Neatorama - Article**

| Home | About Dr. Evermor | Sculptures for Sale | Visit Dr. Evermor's Park | In The News | Video Archive | Contact Dr. Evermor |

http://worldofdrevermor.com/in-the-news-c10897.html                                        1/2

3/10/2014                                              In The News

© 2014 Agent Image All rights reserved. | Terms | Sitemap                    Design by Agent Image - Real Estate Web Site Design

# Forevertron

Coordinates: 43°21′50″N 89°46′18″W

From Wikipedia, the free encyclopedia

***Dr. Evermor's Forevertron***, built in the 1980s, is the largest scrap metal sculpture in the world, standing 50 ft. (15,2 m.) high and 120 ft. (36,5 m.) wide, and weighing 300 tons.[1] It is housed in Dr. Evermore's Art Park on Highway 12, in the town of Sumpter, in Sauk County, Wisconsin, United States.



Panoramic of Dr. Evermor's Forevertron

The sculpture incorporates two Thomas Edison dynamos from the 1880s, lightning rods, high-voltage components from 1920s power plants, scrap from the nearby Badger Army Ammunition Plant, and the decontamination chamber from the Apollo 11 spacecraft.[2] Its fictional creator, *Dr. Evermor*, was born Tom Every[3] in Brooklyn, Wisconsin and is a former demolition expert who spent decades collecting antique machinery for the sculpture and the surrounding fiction that justifies it. According to Every, Dr. Evermor is a Victorian inventor who designed the Forevertron to launch himself, "into the heavens on a magnetic lightning force beam." The Forevertron, despite its size and weight, was designed to be relocatable to a different site—the sculpture is built in sections that are connected by bolts and pins.[2]



Forevertron's Power Source

In addition to the Forevertron itself, the sculpture includes a tea house gazebo from which Every says: "Queen Victoria and Prince Albert may observe the launching of Dr. Evermor; it also includes a giant telescope where skeptics may observe the ascent." Dr. Evermor's art park is home to a large number of other sculptures, many of which relate to the Forevertron, such as the "*Celestial Listening Ear*" and the "*Overlord Master Control Tower*". Other large-scale sculptures include gigantic insects (the "*Juicer Bug*" and "*Arachna Artie*"), the "*Epicurean*" bellows-driven barbecue train, "*The Dragon*", and "*The UFO*". The most numerous sculptures are the "*Bird Band and Orchestra*" which includes nearly 70 birds ranging from the size of a child to twenty feet tall, all made from scrap industrial parts, geological survey markers, knives, loudspeakers, springs, and musical instruments, among other salvaged materials.[2]



Forevertron Bridge

Every says he takes pride in allowing the original materials to remain unaltered as much as possible, using their original forms in new juxtapositions to create his aesthetic. While he himself is not often available for tours of the art park, the site can generally be accessed from passing through the surplus store adjacent to it, Delaney's Surplus. Mr. Every also created much of the installation art for the House on the Rock, including the world's largest carousel.[2]

# References

1. ^ "The Forevertron" (http://www.pbs.org/independentlens/offthemap/html/travelogue_artist_2.htm?true). *PBS, On The Road*.
2. ^ *a b c d* Leslie Umberger (2007). "Sublime Spaces and Visionary Worlds" (http://books.google.com/books?id=3CdgUwZBNwIC&printsec=frontcover&dq=sublime+spaces+and+visionary+worlds&source=bl&ots=fAL580Rli4&sig=7s6sG3iC7Hx6gt7Kb2UGAccwKhw&hl=en&ei=J1P_S5G2C6WwMtaL_Ds&sa=X&oi=book_result&ct=result&resnum=7&ved=0CDkQ6AEwBg#v=onepage&q&f=false). Princeton Architectural Press.
3. ^ "The Mysteries of Dr. Evermore's Forevertron" (http://www.secretsofthecity.com/magazine/reporting/rakish-angle/mysteries-dr-evermores-forevertron). *The Rake Magazine*. 2006-01-25. Retrieved 2009-09-21.

## External links



Bird Symphony's Bass Section

- Field Review Team. "Forevertron" (http://www.roadsideamerica.com/story/2239). RoadsideAmerica.com (http://www.roadsideamerica.com).
- An Artist's Junkyard of Dreams (http://wired-vig.wired.com/news/roadtrip/riverroad/0,2704,65168,00.html) - Article from Wired magazine's Great River Road series.
- Video diaries of the park (http://www.youtube.com/profile_videos?user=madmanitou) - A walk-through of the park in nine unedited videos.
- "LuLu Fry's first-hand experience at **Dr. Evermor's** *fantastical* **Forevertron** just south of Baraboo, WI" (http://www.angelfire.com/planet/dr_evermor/index.html).

Retrieved from "http://en.wikipedia.org/w/index.php?title=Forevertron&oldid=566944417"

Categories: Visionary environments │ Steampunk │ Outdoor sculptures in Wisconsin │ Outsider art │ Buildings and structures in Sauk County, Wisconsin │ Visitor attractions in Sauk County, Wisconsin │ 1980s works



Loudspeaker bird

- This page was last modified on 3 August 2013 at 04:14.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

3/10/2014                                OFF THE MAP . Travelogue . Dr. Evermor | PBS

PBS.org



Stay Connected:

EXPLORE FILMS    TV SCHEDULE    WATCH VIDEO    COMMUNITY CINEMA    CLASSROOM    BLOG    ABOUT



Home | Tour Backyard Paradises | Travelogue | Create Paradise | Backyard Gallery

Choose a Travelogue ▼

## The Forevertron, Baraboo, Wisconsin, USA

**Created by Dr. Evermor, a.k.a. Tom O. Every**
Born 1938, Brooklyn, Wisconsin

A 300-ton kinetic sculpture assembled from relics of the industrial age and designed for space travel, the Forevertron is located behind Delaney's Surplus on Route 12, seven miles south of Baraboo, Wisconsin. Construction on the Forevertron began in 1983 and is ongoing today.



Born in 1938, Tom O. Every the youth was enthralled by "junk." Traveling by bicycle through his neighborhood streets of Brooklyn, Wisconsin, Every sought out unusual objects which he sold, traded and turned into useful gadgets. Every's childhood fascination with historic materials would lead to a career in industrial wreckage, a career he would later question and then renounce in 1983.

*"We're only here a short time. We've got to leave this planet something. We've got to leave it a little better than we found it."*

*— Dr. Evermor*

Working in the wreckage and salvage business, Every traveled to outmoded factories and industrial sites, dismantling well designed but out-dated pieces of machinery. Three decades of "destruction," however, began to take its toll. Every began to see that "many of these shapes and forms would soon disappear from our landscape entirely," he said. "Whether it is tank ends with interesting rivets, shapes that come from breweries, or whatever, because of the metal value they'd be just melted down." Every took it upon himself to save as much of this "stuff" as he could. Unusual components were brought back to Wisconsin. There they were sorted by form and function and stashed away. In the end, Every had amassed a lot of stuff, by his estimate about a thousand tons.

**Out from the Wreckage: Dr. Evermor!**

Every's shift from wrecker to preserver of wreckage led to his "rebirth" as Dr. Evermor. Through this new identity, he would build the Forevertron. Dr. Evermor recalls this important period: "I became Dr. Evermor around 1983

when we started to build the Forevertron. I was a bit upset with the world, not so much the economic conditions as the judicial system and things like that, and I wanted to perpetuate myself back into the heavens on this magnetic lightning force field."

Every concedes that his alter ego, Dr. Evermor, was a pure figment of his imagination. Like the mythological Greek goddess Athena, the doctor sprang to life fully formed at the age of 45. In his new guise, Dr. Evermor was a slightly eccentric Victorian-era professor-inventor from Eggington, England. As a child, Evermor had been trapped in a huge electrical storm with his father, a Presbyterian minister. Such a storm, his father said, could only come from the hand of God. This event made a big impression on the future doctor. From that day forward, Dr. Evermor knew what he had to do. He would move to Wisconsin and from relics of the industrial age, he would build the Forevertron. This circa 1890s spacecraft would be his salvation.

**Recycling Industrial History**

Fortunately, Dr. Evermor had friends in the right places. Soon he was assembling salvaged materials from Every's warehouse, building what would grow to be his 300-ton contraption. The Forevertron is made up of carburetors and generators, early x-ray machines and theater speakers, river barges and hamburger signs, to name just a few of its components. The end result is important to Dr. Evermor. Possibly more important, however, is that each historic piece speak for itself. His aim is to blend these objects while preserving their individuality and unique form: "Rather than imposing one's will on



something that's already been created, you leave it alone and you just add or move another piece in as a blender that'll tie it from one to another... things that were of historic significance we leave alone." For example, the pair of late nineteenth-century bi-polar dynamos acquired from the Henry Ford Museum stand on their own while being seamlessly integrated into the Forevertron.

### La Pièce de Résistance

Of all the parts used to build the Forevertron, Dr. Evermor is especially proud of one:  the decontamination chamber from the Apollo Space Mission. He recounts the history of its salvage: "The Apollo decontamination chamber was in three trailers [donated to a university]. but I wrecked and scrapped most of it, but I kept the two autoclaves that the moon rocks were passed through. We contacted NASA to try to get papers authenticating it, and boy—they're very touchy about what happened to that stuff. We did get the original drawings and it's the same damn thing."

The Forevertron is a masterfully crafted 300-ton sculpture made of recycled parts. Above thrusters and electromagnetic power sources sits a glass ball inside a copper egg which will serve as Dr. Evermor's space capsule. Peripheral parts include the Overlord Master Control, which functions as the electric hub and brain of the Forevertron. The Gravitron will shrink Dr. Evermor down in preparation for space travel. The Celestial Listening Ear allows Evermor to broadcast his observations from space to those back home.

### It's all in his Head

Possibly the most amazing thing about the Forevertron and other Dr. Evermor sculptures is there are no blueprints. The plans reside only in Dr. Evermor's brain: "No sketches, no models, no nothing. I just go for it." Many of these sculptures, like the Juicer Bug, for example, weigh more than 15 tons. The body of the Bug was hoisted onto spindly legs, a tricky proposition for even the most adept engineer. Dr. Evermor has learned to rely on his own calculations. As he says, "no engineering firm could compute the compression on these legs."

### Preserve the Past, Highball it to the Future

The Forevertron accomplishes several ends for the resourceful Dr. Evermor. On a historical level, it preserves the shapes, forms and mechanisms of the fast-disappearing industrial age. On a creative level, the Forevertron is nothing short of art. It is the world's largest and most visually balanced kinetic sculpture. And, on a purely practical level, the Forevertron will allow Dr. Evermor to achieve his dream. With his invention, on a magnetic lightning force field, he will highball himself to heaven—far from the "phoniness of this world."

An event like the Forevertron launch should not be missed and Dr. Evermor has designed his nineteenth-century theme park with the crowds in mind. For those who come to witness "history," Evermor promises a treat for the senses. Eyes will feast on the mass and grace of the Forevertron. Ears will take in the musical sounds of the 70-member bird band, whimsically delicate creatures made from brass bedposts, survey markers and gasoline nozzles. Taste buds will be treated to popcorn the old fashioned way, served from a turn-of-the-century popcorn stand. The Epicurean, a wheeled cart of Dr. Evermor's design, features a striped canopy, a chimney, enormous bellows and a barbecue pit six feet wide.

The Forevertron is located behind Delaney's Surplus, across the highway from the Badger Army Ammunition Factory on State Highway 12, seven miles south of Baraboo, Wisconsin and seven miles north of Prairie du Sac. It can be visited on Monday through Saturday from 9AM to 5PM and on Sunday from 12 to 5PM. Times subject to change.

 The Site Today

The Forevertron and other sculptures created by Dr. Evermor from relics past can be visited Monday through Saturday, 9:00-5:00 p.m., Sunday 12:00-5:00 p.m. Times subject to change. If you visit on a warm spring day, you might even catch the pith-helmeted nineteenth-century Victorian inventor on the premises.



"I became Dr. Evermor around 1983 when we started to build the Forevertron. I was a bit upset with the world, not so much the economic conditions as the judicial system and things like that, and I wanted to perpetuate myself back into the heavens on this magnetic lightning force field."

**Off the Map** - A look into backyard paradises created by visionary artists around the world
Home | What is Visionary Art? | Tours | Travelogue | Create Paradise | Backyard Gallery | Classroom | Resources | Talkback
An Independent Lens / Electric Shadows Web-Exclusive Presentation

© 2014 Interactive Knowledge Inc.                                    Credits   Privacy Policy

PTO Form 1957 (Rev 9/2005)
OMB No. 0651-0050 (Exp, 07/31/2017)

# Response to Office Action

**The table below presents the data as entered.**

| Input Field | Entered |
|---|---|
| **SERIAL NUMBER** | 85933243 |
| **LAW OFFICE ASSIGNED** | LAW OFFICE 101 |
| **MARK SECTION** | |
| MARK | http://tsdr.uspto.gov/img/85933243/large |
| LITERAL ELEMENT | EVERMORE |
| STANDARD CHARACTERS | YES |
| USPTO-GENERATED IMAGE | YES |
| MARK STATEMENT | The mark consists of standard characters, without claim to any particular font style, size or color. |
| **ARGUMENT(S)** | |

### RESPONSE TO OFFICE ACTION

This is in response to the Office Action dated September 9, 2013, which was received in connection with the above-identified application. The Office Action rejects the application pursuant to Section 2(d) of the Trademark Act on the grounds that a likelihood of confusion exists between the Applicant's mark and trademark serial no. 85/447,625 for the mark "DR. EVERMOR" (the "Cited Application").

Reconsideration and allowance of the application is hereby respectfully requested because, as set forth in detail below, Applicant's mark is not likely to cause confusion or mistake with the Cited Application.

### Remarks

In *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357 (C.C.P.A. 1973), the Court of Customs and Patent Appeals discussed the factors relevant to a determination of likelihood of confusion. In ex parte examination, the issue of likelihood of confusion typically revolves around the similarity or dissimilarity of the marks and the relatedness of the goods or services. The other factors listed in *du Pont* may be considered if relevant evidence is contained in the record. *See In re Majestic Distilling Co.*, 315 F.3d 1311, 1315 (Fed. Cir. 2003) ("Not all of the *DuPont* factors may be relevant or of equal weight in a given case, and 'any one of the factors may control a particular case,'" *quoting In re Dixie Restaurants, Inc.*, 105 F.3d 1405, 1406-07 (Fed. Cir. 1997)); *In re National Novice Hockey League, Inc.*, 222 USPQ 638, 640 (TTAB 1984). In an ex parte case, the following factors are usually the most relevant:

1.   The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.

2.   The relatedness of the goods or services as described in an application or registration or in connection with which a prior mark is in use.

3.   The similarity or dissimilarity of established, likely-to-continue trade channels.

4.   The conditions under which and buyers to whom sales are made, i.e. "impulse" vs. careful, sophisticated purchasing.

The Applicant asserts that there is no likelihood of confusion between the Applicant's Mark and the Cited Application for the following reasons.

**I.   There is No Likelihood of Confusion When the Marks are considered in Their Entirety.**

The Cited Mark and the Applicant's marks must be considered in their entireties when determining whether there is likelihood of confusion and the likelihood of confusion cannot be predicated on dissection of a mark; that is, on only part of a mark.  *See In re National Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985).  The Court of Appeals for the Federal Circuit has provided the following guidance with regard to determining and articulating likelihood of confusion:

> The basic principle in determining confusion between marks is that marks must be compared in their entireties and must be considered in connection with the particular goods or services for which they are used (citations omitted). It follows from that principle that likelihood of confusion cannot be predicated on dissection of a mark, that is, on only part of a mark (footnote omitted).

*In re National Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985) (emphasis added); *see* TMEP § 1207.01.

Additionally, the question in a likelihood of confusion analysis is not whether people will confuse the marks, but whether the marks will confuse people into believing that the goods they identify come from the same source. *In re West Point-Pepperell, Inc.*, 468 F.2d 200, 175 USPQ 558 (C.C.P.A. 1972).  For that reason, the test of likelihood of confusion is not whether the marks can be distinguished when subjected to a side-by-side comparison.  The question is whether the marks create the same overall impression.  *See Recot, Inc. v. M.C. Becton*, 214 F.2d 1322, 54 USPQ2d 1894, 1890 (Fed. Cir. 2000); *Visual Information Inst., Inc. v. Vicon Indus. Inc.*, 209 USPQ 179 (TTAB 1980).  The focus is on the recollection of the average purchaser who normally retains a general rather than specific impression of trademarks.  *See Chemetron Corp. v. Morris Coupling & Clamp Co.*, 203 USPQ 537 (TTAB 1979); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975); TMEP §1207.01(b).  The analysis of these issues brings the factors listed above into consideration.

The title "Dr." in the Cited Mark provides a distinct commercial impression for several reasons.    First, the addition of the honorific title "Dr." changes the commercial impression of the Cited Mark.    The title Dr. has been associated with societal status and education from time immemorial.  TMEP § 1207.01(b)(iii) provides that "[a]dditions or deletions to marks may be sufficient to avoid a likelihood of confusion if: (1) the marks in their entireties convey significantly different commercial impression...."  The Applicant respectfully asserts that the addition of the honorific title "Dr." is more than a mere "peripheral difference[]" between the Applicant's Mark and the Cited Mark.   *C.f.* TMEP § 1207.01(b)(iii) ("[I]f the dominant portion of both marks is the same, then the marks may be confusingly similar notwithstanding *peripheral differences*.")

The only consideration given in the Office Action to the honorific title "Dr." in the cited mark is the assertion that "the deletion of the DR. portion from registrant's mark is not sufficient to avoid confusion. The mere deletion of wording from a registered mark may not be sufficient to overcome a likelihood of confusion."   Office Action at page 2.  The foregoing is merely a conclusion—not an analysis supporting the assertion that the consuming public would deem the honorific title "Dr." to constitute merely a "peripheral difference[]."

Second, the title "Dr." is applied to a person, thus communicating to the public that "Dr. Evermor" refers to an individual. This fact is confirmed by the "Name/Portrait Statement" included in the Cited Mark.    Specifically, the Cited Mark indicates that "Dr. Evermor" is a "pseudonym of Thomas Owen Every, a living individual...."    The specimen showing use of the Cited Mark provides: "Visit Dr. Evermor's Park," "Now is your chance to own a little piece of Dr. Evermor's incredible imagination," and "Contact Dr. Evermor."    A copy of the specimen of use submitted in connection with the Cited Mark is attached as Exhibit 1, and shows the foregoing use of the Cited Mark.  Attached as Exhibit 2 is the "In the News" page from Dr. Evermor's site and printouts from the Wikipedia.org and PBS.org pages that are listed on Dr. Evermor's "In the News" page.    The PBS.org attached as Exhibit 2 states "I [Thomas Owen Every] became Dr. Evermor around 1983 when we started to build the Forevertron." In this particular context, the public would correctly assume that Dr. Evermor is the proprietor of the theme park bearing his name.  No similar association would be reached in connection with the Applicant's Mark.

For at least these reasons, the Applicant respectfully asserts that there is no likelihood of confusion between the Cited Mark and the Applicant's mark, and the rejection entered under § 2(d) should be withdrawn.

**II. The Goods Recited in Applicant's Mark and the Cited Registration are Distinguishable.**

Although the Office Action notes that the goods and services recited in the Applicant's Mark and the Cited Mark are different, the Office Action concludes that the goods are services are likely to be confused because "[t]he services would be marketed to people who are interested in visiting an entertainment venue."   The Applicant respectfully notes that this characterization overgeneralizes the goods and services recited in both the Applicant's Mark and the Cited Mark.

The TMEP indicates that it is appropriate to consider the "similarity or dissimilarity of established, likely-to-continue trade channels."   TMEP §1207.01.  The website operated by "Dr. Evermor" and the Wikipedia.org page linked to by "Dr. Evermor's" site shows that the Cited Mark has been used at all relevant times as follows:

Dr. Evermor's Forevertron, built in the 1980s, is the largest scrap metal sculpture in the world, standing 50 ft. (15,2 m.) high and 120 ft. (36,5 m.) wide, and weighing 300 tons. It is housed in Dr. Evermor's Art Park on Highway 12, in the town of Sumpter, in Sauk County, Wisconsin, United States.

See Exhibit 2, at page 4.

Given that the Cited Mark has been used in connection with a scrap metal sculpture and associated "Art Park" since the 1980s, the Applicant asserts that the Cited Mark has "established, likely-to-continue trade channels…." These "established, likely-to-continue trade channels" pertain to the scrap metal garden located in the town of Sumpter, Wisconsin, where "Dr. Evermor's" one-of-a-kind sculpture is located. Further, the Applicant respectfully asserts that the channels of trade focusing on consumers interested in visiting the scrap metal garden located in the town of Sumpter, Wisconsin are likely to have a unique interest or curiosity that is _not_ reasonably equivalent to channels seeking "people who are interested in visiting an entertainment venue." Contrary to the assertion in the Office Action, the consumers who may be interested in the specific venue with which the Cited Mark is used would likely encompass a small subset of "people who are interested in visiting an entertainment venue."

For at least this reason, the Applicant respectfully asserts that there is no likelihood of confusion between the Cited Mark and the Applicant's mark, and the rejection entered under § 2(d) should be withdrawn.

**<u>Conclusion</u>**

This response is believed to address all of the issues raised by the Examining Attorney. This application is now believed to be in condition for registration. In the event the Examining Attorney does not agree with the sufficiency of this Response and Amendment, Applicant respectfully requests that Applicant be given the opportunity to respond to any outstanding issues. Applicant invites the Examining attorney to address any remaining issues in a telephone conference with the undersigned. Please note that all correspondence regarding this application should be directed to the attention of the undersigned.

## EVIDENCE SECTION

| EVIDENCE FILE NAME(S) | |
|---|---|
| **ORIGINAL PDF FILE** | evi_233058189-194117736_._Exhibit_1_-_Specimen_from_Cited_Mark.pdf |
| **CONVERTED PDF FILE(S)** (1 page) | \\TICRS\EXPORT16\IMAGEOUT16\859\332\85933243\xml4\ROA0002.JPG |
| **ORIGINAL PDF FILE** | evi_233058189-194117736_._Exhibit_2_-_About_Dr_Evermor_Page.pdf |
| **CONVERTED PDF FILE(S)** (7 pages) | \\TICRS\EXPORT16\IMAGEOUT16\859\332\85933243\xml4\ROA0003.JPG |
| | \\TICRS\EXPORT16\IMAGEOUT16\859\332\85933243\xml4\ROA0004.JPG |
| | \\TICRS\EXPORT16\IMAGEOUT16\859\332\85933243\xml4\ROA0005.JPG |
| | \\TICRS\EXPORT16\IMAGEOUT16\859\332\85933243\xml4\ROA0006.JPG |
| | \\TICRS\EXPORT16\IMAGEOUT16\859\332\85933243\xml4\ROA0007.JPG |
| | \\TICRS\EXPORT16\IMAGEOUT16\859\332\85933243\xml4\ROA0008.JPG |
| | \\TICRS\EXPORT16\IMAGEOUT16\859\332\85933243\xml4\ROA0009.JPG |
| **DESCRIPTION OF EVIDENCE FILE** | Specimen submitted with the Cited Mark; website pages |

## SIGNATURE SECTION

| | |
|---|---|
| **RESPONSE SIGNATURE** | /Jared L. Cherry/ |
| **SIGNATORY'S NAME** | Jared L. Cherry |
| **SIGNATORY'S POSITION** | Attorney of Record, Utah bar member |
| **SIGNATORY'S PHONE NUMBER** | 8019354935 |
| **DATE SIGNED** | 03/10/2014 |

| | |
|---|---|
| **AUTHORIZED SIGNATORY** | YES |
| **FILING INFORMATION SECTION** | |
| **SUBMIT DATE** | Mon Mar 10 20:00:42 EDT 2014 |
| **TEAS STAMP** | USPTO/ROA-XX.XX.XX.XXX-20 140310200042916277-859332 43-500813a5cea56e8b9a86c0 5f8113c2f782c4bf3c16d811a d9b362c5fc564498a-N/A-N/A -20140310194117736631 |

PTO Form 1957 (Rev 9/2005)
OMB No. 0651-0050 (Exp. 07/31/2017)

## Response to Office Action

## To the Commissioner for Trademarks:

Application serial no. **85933243** EVERMORE(Standard Characters, see http://tsdr.uspto.gov/img/85933243/large) has been amended as follows:

**ARGUMENT(S)**
**In response to the substantive refusal(s), please note the following:**

### RESPONSE TO OFFICE ACTION

This is in response to the Office Action dated September 9, 2013, which was received in connection with the above-identified application. The Office Action rejects the application pursuant to Section 2(d) of the Trademark Act on the grounds that a likelihood of confusion exists between the Applicant's  mark and trademark serial no. 85/447,625 for the mark "DR. EVERMOR" (the "Cited Application").

Reconsideration and allowance of the application is hereby respectfully requested because, as set forth in detail below, Applicant's mark is not likely to cause confusion or mistake with the Cited Application.

### Remarks

In *In re E. I. du Pont de Nemours & Co.*, 476 F.2d 1357 (C.C.P.A. 1973), the Court of Customs and Patent Appeals discussed the factors relevant to a determination of likelihood of confusion. In ex parte examination, the issue of likelihood of confusion typically revolves around the similarity or dissimilarity of the marks and the relatedness of the goods or services. The other factors listed in *du Pont* may be considered if relevant evidence is contained in the record. *See In re Majestic Distilling Co.*, 315 F.3d 1311, 1315 (Fed. Cir. 2003) ("Not all of the  *DuPont* factors may be relevant or of equal weight in a given case, and 'any one of the factors may control a particular case,'"  quoting *In re Dixie Restaurants, Inc.*, 105 F.3d 1405, 1406-07 (Fed. Cir. 1997)); *In re National Novice Hockey League, Inc.*, 222 USPQ 638, 640 (TTAB 1984). In an ex parte case, the following factors are usually the most relevant:

1.   The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression.

2.   The relatedness of the goods or services as described in an application or registration or in connection with which a prior mark is in use.

3.   The similarity or dissimilarity of established, likely-to-continue trade channels.

4.   The conditions under which and buyers to whom sales are made, i.e. "impulse" vs. careful, sophisticated purchasing.

The Applicant asserts that there is no likelihood of confusion between the Applicant's Mark and the Cited Application for the following reasons.

### I.   There is No Likelihood of Confusion When the Marks are considered in Their Entirety.

The Cited Mark and the Applicant's marks must be considered in their entireties when determining whether there is likelihood of confusion and the likelihood of confusion cannot be predicated on dissection of a mark; that is, on only part of a mark.  *See In re National Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985).  The Court of Appeals for the Federal Circuit has provided the following guidance with regard to determining and articulating likelihood of confusion:

> The basic principle in determining confusion between marks is that marks must be compared <u>in their entireties</u> and must be considered in connection with the particular goods or services for which they are used (citations omitted). It follows from that principle that likelihood of confusion cannot be predicated on dissection of a mark, that is, on only part of a mark (footnote omitted).

*In re National Data Corp.*, 753 F.2d 1056, 1058 (Fed. Cir. 1985) (emphasis added); *see* TMEP § 1207.01.

Additionally, the question in a likelihood of confusion analysis is not whether people will confuse the marks, but whether the marks will confuse people into believing that the goods they identify come from the same source.  *In re West Point-Pepperell, Inc.*, 468 F.2d 200, 175 USPQ 558 (C.C.P.A. 1972).  For that reason, the test of likelihood of confusion is not whether the marks can be distinguished when subjected to a side-by-side comparison.  The question is whether the marks create the same overall impression.  *See Recot, Inc. v. M.C. Becton*, 214 F.2d 1322, 54 USPQ2d 1894, 1890 (Fed. Cir. 2000); *Visual Information Inst., Inc. v. Vicon Indus. Inc.*, 209 USPQ 179 (TTAB 1980).  The focus is on the recollection of the average purchaser who normally retains a general rather than specific impression of trademarks.  *See Chemetron Corp. v. Morris Coupling & Clamp Co.*, 203 USPQ 537 (TTAB 1979); *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975); TMEP §1207.01(b).  The analysis of these issues brings the factors listed above into consideration.

The title "Dr." in the Cited Mark provides a distinct commercial impression for several reasons.   First, the addition of the honorific title "Dr." changes the commercial impression of the Cited Mark.   The title Dr. has been associated with societal status and education from time immemorial.  TMEP § 1207.01(b)(iii) provides that "[a]dditions or deletions to marks may be sufficient to avoid a likelihood of confusion if: (1) the marks in their entireties convey significantly different commercial impression…."  The Applicant respectfully asserts that the addition of the honorific title "Dr." is more than a mere "peripheral difference[]" between the Applicant's Mark and the Cited Mark.   *C.f.* TMEP § 1207.01(b)(iii) ("[I]f the dominant portion of both marks is the same, then the marks may be confusingly similar notwithstanding *peripheral differences*.")

The only consideration given in the Office Action to the honorific title "Dr." in the cited mark is the assertion that "the deletion of the DR. portion from registrant's mark is not sufficient to avoid confusion. The mere deletion of wording from a registered mark may not be sufficient to overcome a likelihood of confusion."  Office Action at page 2.  The foregoing is merely a conclusion—not an analysis supporting the assertion that the consuming public would deem the honorific title "Dr." to constitute merely a "peripheral difference[]."

Second, the title "Dr." is applied to a person, thus communicating to the public that "Dr. Evermor" refers to an individual.  This fact is confirmed by the "Name/Portrait Statement" included in the Cited Mark.   Specifically, the Cited Mark indicates that "Dr. Evermor" is a "pseudonym of Thomas Owen Every, a living individual…."   The specimen showing use of the Cited Mark provides: "Visit Dr. Evermor's Park," "Now is your chance to own a little piece of Dr. Evermor's incredible imagination," and "Contact Dr. Evermor."  A copy of the specimen of use submitted in connection with the Cited Mark is attached as Exhibit 1, and shows the foregoing use of the Cited Mark.  Attached as Exhibit 2 is the "In the News" page from Dr. Evermor's site and printouts from the Wikipedia.org and PBS.org pages that are listed on Dr. Evermor's "In the News" page.   The PBS.org attached as Exhibit 2 states "I [Thomas Owen Every] became Dr. Evermor around 1983 when we started to build the Forevertron." In this particular context, the public would correctly assume that Dr. Evermor is the proprietor of the theme park bearing his name.  No similar association would be reached in connection with the Applicant's Mark.

For at least these reasons, the Applicant respectfully asserts that there is no likelihood of confusion between the Cited Mark and the Applicant's mark, and the rejection entered under § 2(d) should be withdrawn.

### II.  The Goods Recited in Applicant's Mark and the Cited Registration are Distinguishable.

Although the Office Action notes that the goods and services recited in the Applicant's Mark and the Cited Mark are different, the Office Action concludes that the goods are services are likely to be confused because "[t]he services would be marketed to people who are interested in visiting an entertainment venue."   The Applicant respectfully notes that this characterization overgeneralizes the goods and services recited in both the Applicant's Mark and the Cited Mark.

The TMEP indicates that it is appropriate to consider the "similarity or dissimilarity of established, likely-to-continue trade channels."   TMEP §1207.01.  The website operated by "Dr. Evermor" and the Wikipedia.org page linked to by "Dr. Evermor's" site shows that the Cited Mark has been used at all relevant times as follows:

Dr. Evermor's Forevertron, built in the 1980s, is the largest scrap metal sculpture in the world, standing 50 ft. (15,2 m.) high and 120 ft. (36,5 m.) wide, and weighing 300 tons. It is housed in Dr. Evermor's Art Park on Highway 12, in the town of Sumpter, in Sauk County, Wisconsin, United States.

See Exhibit 2, at page 4.

Given that the Cited Mark has been used in connection with a scrap metal sculpture and associated "Art Park" since the 1980s, the Applicant asserts that the Cited Mark has "established, likely-to-continue trade channels…."  These "established, likely-to-continue trade channels" pertain to the scrap metal garden located in the town of Sumpter, Wisconsin, where "Dr. Evermor's" one-of-a-kind sculpture is located.  Further, the Applicant respectfully asserts that the channels of trade focusing on consumers interested in visiting the scrap metal garden located in the town of Sumpter, Wisconsin are likely to have a unique interest or curiosity that is *not* reasonably equivalent to channels seeking "people who are interested in visiting an entertainment venue." Contrary to the assertion in the Office Action, the consumers who may be interested in the specific venue with which the Cited Mark is used would likely encompass a small subset of "people who are interested in visiting an entertainment venue."

For at least this reason, the Applicant respectfully asserts that there is no likelihood of confusion between the Cited Mark and the Applicant's mark, and the rejection entered under § 2(d) should be withdrawn.

### Conclusion

This response is believed to address all of the issues raised by the Examining Attorney.  This application is now believed to be in condition for registration.  In the event the Examining Attorney does not agree with the sufficiency of this Response and Amendment, Applicant respectfully requests that Applicant be given the opportunity to respond to any outstanding issues.  Applicant invites the Examining attorney to address any remaining issues in a telephone conference with the undersigned.
Please note that all correspondence regarding this application should be directed to the attention of the undersigned.

**EVIDENCE**
Evidence in the nature of Specimen submitted with the Cited Mark; website pages has been attached.
**Original PDF file:**
evi_233058189-194117736_._Exhibit_1_-_Specimen_from_Cited_Mark.pdf
**Converted PDF file(s)** ( 1 page)
Evidence-1
**Original PDF file:**
evi_233058189-194117736_._Exhibit_2_-_About_Dr_Evermor_Page.pdf
**Converted PDF file(s)** ( 7 pages)
Evidence-1
Evidence-2
Evidence-3
Evidence-4
Evidence-5
Evidence-6
Evidence-7

**SIGNATURE(S)**
**Response Signature**
Signature: /Jared L. Cherry/    Date: 03/10/2014
Signatory's Name: Jared L. Cherry
Signatory's Position: Attorney of Record, Utah bar member

Signatory's Phone Number: 8019354935

The signatory has confirmed that he/she is an attorney who is a member in good standing of the bar of the highest court of a U.S. state, which includes the District of Columbia, Puerto Rico, and other federal territories and possessions; and he/she is currently the applicant's attorney or an associate thereof; and to the best of his/her knowledge, if prior to his/her appointment another U.S. attorney or a Canadian attorney/agent not currently associated with his/her company/firm previously represented the applicant in this matter: (1) the applicant has filed or is concurrently filing a signed revocation of or substitute power of attorney with the USPTO; (2) the USPTO has granted the request of the prior representative to withdraw; (3) the applicant has filed a power of attorney appointing him/her in this matter; or (4) the applicant's appointed U.S. attorney or Canadian attorney/agent has filed a power of attorney appointing him/her as an associate attorney in this matter.

Serial Number: 85933243
Internet Transmission Date: Mon Mar 10 20:00:42 EDT 2014
TEAS Stamp: USPTO/ROA-XX.XX.XX.XXX-20140310200042916
277-85933243-500813a5cea56e8b9a86c05f811
3c2f782c4bf3c16d811ad9b362c5fc564498a-N/
A-N/A-20140310194117736631

Dr. Evermor                                                                                    Page 1 of 1



**Dr. Evermor's limited edition, intergalactic "Time Traveler Token" has ARRIVED!!!**

Now is your chance to own a little piece of Dr. Evermor's incredible imagination in a palm sized, 2 1/2" inch, work of art! On one side of the token is his famous "Forevertron," one of the world's largest scrap metal sculptures in existence today. On the other side, you will see his "Intergalactic Space Ship." Each coin has a positive spiritual message that Doc. would like to share...

"Intergalactic - You - All - Safe - Here - Hold - Hands - Head - Heart - Hope - Happy - Healing - Forevermor"

Power on!

Dr. Evermor



About Dr. Evermor | Recent Projects | Visit Dr. Evermor's Park | In The News | Video Archive | Contact Dr. Evermor

© Copyright 2008 Dr. Evermor. All rights reserved. Terms | Sitemap                    Design by Agent Image

3/10/2014 About Dr. Evermor

ABOUT DR. EVERMOR | SCULPTURES FOR SALE | VISIT DR. EVERMOR'S PARK | IN THE NEWS | VIDEO ARCHIVE | CONTACT DR. EVERMOR

Home

Online Store

Books for Sale

Videos for Sale

Photos By Tya





Tya Kottler
608-381-0465
tya@tds.net



Find My Dream Home

What Is My Home Worth?

Help Me Relocate!

## About Dr. Evermor

Dr. Evermore currently resides at the following address:

Tom Every

Maplewood of Sauk Prairie

245 Sycamore St.

Sauk City, WI 53583

© 2014 Agent Image All rights reserved. | Terms | Sitemap

Design by Agent Image - Real Estate Web Site Design

3/10/2014                                    In The News

http://www.roadsideamerica.com/story/2239

| ABOUT DR. EVERMOR | SCULPTURES FOR SALE | VISIT DR. EVERMOR'S PARK | IN THE NEWS | VIDEO ARCHIVE | CONTACT DR. EVERMOR |

Home

Online Store

Books for Sale

Videos for Sale

Photos By Tya





Tya Kottler
608-381-0465
tya@tds.net

**NEED ASSISTANCE?**

Find My Dream Home

What Is My Home Worth?

Help Me Relocate!

**Roadside America**
**'American Pickers' Like Every's Hidden Gems**
**Forevertron - Wikipedia**
**PBS - Off the Map**

**Neatorama - Article**

| Home | About Dr. Evermor | Sculptures for Sale | Visit Dr. Evermor's Park | In The News | Video Archive | Contact Dr. Evermor |

http://worldofdrevermor.com/in-the-news-c10897.html                                    1/2

3/10/2014                                          In The News

© 2014 Agent Image All rights reserved.  |  Terms  |  Sitemap                    Design by Agent Image - Real Estate Web Site Design

# Forevertron

Coordinates: 43°21′50″N 89°46′18″W

From Wikipedia, the free encyclopedia

***Dr. Evermor's Forevertron***, built in the 1980s, is the largest scrap metal sculpture in the world, standing 50 ft. (15,2 m.) high and 120 ft. (36,5 m.) wide, and weighing 300 tons.[1] It is housed in Dr. Evermore's Art Park on Highway 12, in the town of Sumpter, in Sauk County, Wisconsin, United States.



Panoramic of Dr. Evermor's Forevertron

The sculpture incorporates two Thomas Edison dynamos from the 1880s, lightning rods, high-voltage components from 1920s power plants, scrap from the nearby Badger Army Ammunition Plant, and the decontamination chamber from the Apollo 11 spacecraft.[2] Its fictional creator, *Dr. Evermor*, was born Tom Every[3] in Brooklyn, Wisconsin and is a former demolition expert who spent decades collecting antique machinery for the sculpture and the surrounding fiction that justifies it. According to Every, Dr. Evermor is a Victorian inventor who designed the Forevertron to launch himself, "into the heavens on a magnetic lightning force beam." The Forevertron, despite its size and weight, was designed to be relocatable to a different site—the sculpture is built in sections that are connected by bolts and pins.[2]



Forevertron's Power Source

In addition to the Forevertron itself, the sculpture includes a tea house gazebo from which Every says: "Queen Victoria and Prince Albert may observe the launching of Dr. Evermor; it also includes a giant telescope where skeptics may observe the ascent." Dr. Evermor's art park is home to a large number of other sculptures, many of which relate to the Forevertron, such as the "*Celestial Listening Ear*" and the "*Overlord Master Control Tower*". Other large-scale sculptures include gigantic insects (the "*Juicer Bug*" and "*Arachna Artie*"), the "*Epicurean*" bellows-driven barbecue train, "*The Dragon*", and "*The UFO*". The most numerous sculptures are the "*Bird Band and Orchestra*" which includes nearly 70 birds ranging from the size of a child to twenty feet tall, all made from scrap industrial parts, geological survey markers, knives, loudspeakers, springs, and musical instruments, among other salvaged materials.[2]



Forevertron Bridge

Every says he takes pride in allowing the original materials to remain unaltered as much as possible, using their original forms in new juxtapositions to create his aesthetic. While he himself is not often available for tours of the art park, the site can generally be accessed from passing through the surplus store adjacent to it, Delaney's Surplus. Mr. Every also created much of the installation art for the House on the Rock, including the world's largest carousel.[2]

# References

1. ^ "The Forevertron" (http://www.pbs.org/independentlens/offthemap/html/travelogue_artist_2.htm?true). *PBS, On The Road*.
2. ^ *a b c d* Leslie Umberger (2007). "Sublime Spaces and Visionary Worlds" (http://books.google.com/books?id=3CdgUwZBNwIC&printsec=frontcover&dq=sublime+spaces+and+visionary+worlds&source=bl&ots=fAL580Rli4&sig=7s6sG3iC7Hx6gt7Kb2UGAccwKhw&hl=en&ei=J1P_S5G2C6WwMtaL_Ds&sa=X&oi=book_result&ct=result&resnum=7&ved=0CDkQ6AEwBg#v=onepage&q&f=false). Princeton Architectural Press.
3. ^ "The Mysteries of Dr. Evermore's Forevertron" (http://www.secretsofthecity.com/magazine/reporting/rakish-angle/mysteries-dr-evermores-forevertron). *The Rake Magazine*. 2006-01-25. Retrieved 2009-09-21.

## External links



Bird Symphony's Bass Section

- Field Review Team. "Forevertron" (http://www.roadsideamerica.com/story/2239). RoadsideAmerica.com (http://www.roadsideamerica.com).
- An Artist's Junkyard of Dreams (http://wired-vig.wired.com/news/roadtrip/riverroad/0,2704,65168,00.html) - Article from Wired magazine's Great River Road series.
- Video diaries of the park (http://www.youtube.com/profile_videos?user=madmanitou) - A walk-through of the park in nine unedited videos.
- "LuLu Fry's first-hand experience at **Dr. Evermor's** *fantastical* **Forevertron** just south of Baraboo, WI" (http://www.angelfire.com/planet/dr_evermor/index.html).



Loudspeaker bird

Retrieved from "http://en.wikipedia.org/w/index.php?title=Forevertron&oldid=566944417"

Categories: Visionary environments │ Steampunk │ Outdoor sculptures in Wisconsin │ Outsider art │ Buildings and structures in Sauk County, Wisconsin │ Visitor attractions in Sauk County, Wisconsin │ 1980s works

- This page was last modified on 3 August 2013 at 04:14.
- Text is available under the Creative Commons Attribution-ShareAlike License; additional terms may apply. By using this site, you agree to the Terms of Use and Privacy Policy. Wikipedia® is a registered trademark of the Wikimedia Foundation, Inc., a non-profit organization.

3/10/2014                          OFF THE MAP . Travelogue . Dr. Evermor | PBS

PBS.org

PBS HOME | PROGRAMS A-Z | TV SCHEDULES | WATCH VIDEO | DONATE | SHOP PBS | SEARCH PBS

[i] INDEPENDENTLENS        A film festival in your living room        Stay Connected: Facebook Twitter YouTube RSS

EXPLORE FILMS    TV SCHEDULE    WATCH VIDEO    COMMUNITY CINEMA    CLASSROOM    BLOG    ABOUT



Home | Tour Backyard Paradises | Travelogue | Create Paradise | Backyard Gallery

Choose a Travelogue ▼

## The Forevertron, Baraboo, Wisconsin, USA

**Created by Dr. Evermor, a.k.a. Tom O. Every**
Born 1938, Brooklyn, Wisconsin

A 300-ton kinetic sculpture assembled from relics of the industrial age and designed
for space travel, the Forevertron is located behind Delaney's Surplus on Route 12,
seven miles south of Baraboo, Wisconsin. Construction on the Forevertron began in
1983 and is ongoing today.



Born in 1938, Tom O.
Every the youth was
enthralled by "junk."
Traveling by bicycle
through his neighborhood
streets of Brooklyn,
Wisconsin, Every sought
out unusual objects which
he sold, traded and turned
into useful gadgets.
Every's childhood
fascination with historic
materials would lead to a career in industrial wreckage, a career he would later
question and then renounce in 1983.

*"We're only here a short time. We've got
to leave this planet something. We've got to
leave it a little better than we found it."*

**— Dr. Evermor**

Working in the wreckage and salvage business, Every traveled to outmoded
factories and industrial sites, dismantling well designed but out-dated pieces of
machinery. Three decades of "destruction," however, began to take its toll.
Every began to see that "many of these shapes and forms would soon disappear
from our landscape entirely," he said. "Whether it is tank ends with interesting
rivets, shapes that come from breweries, or whatever, because of the metal
value they'd be just melted down." Every took it upon himself to save as much of
this "stuff" as he could. Unusual components were brought back to Wisconsin.
There they were sorted by form and function and stashed away. In the end,
Every had amassed a lot of stuff, by his estimate about a thousand tons.

**Out from the Wreckage: Dr. Evermor!**

Every's shift from wrecker to preserver of wreckage led to his "rebirth" as Dr.
Evermor. Through this new identity, he would build the Forevertron. Every
recalls this important period: "I became Dr. Evermor around 1983

when we started to build the Forevertron. I was a bit upset with the world, not so
much the economic conditions as the judicial system and things like that, and I
wanted to perpetuate myself back into the heavens on this magnetic lightning
force field."

Every concedes that his alter ego, Dr. Evermor, was a pure figment of his
imagination. Like the mythological Greek goddess Athena, the doctor sprang to
life fully formed at the age of 45. In his new guise, Dr. Evermor was a slightly
eccentric Victorian-era professor-inventor from Eggington, England. As a child,
Evermor had been trapped in a huge electrical storm with his father, a
Presbyterian minister. Such a storm, his father said, could only come from the
hand of God. This event made a big impression on the future doctor. From that
day forward, Dr. Evermor knew what he had to do. He would move to Wisconsin
and from relics of the industrial age, he would build the Forevertron. This circa
1890s spacecraft would be his salvation.

**Recycling Industrial History**

Fortunately, Dr. Evermor had friends in the right places. Soon he was
assembling salvaged materials from Every's warehouse, building what would
grow to be his 300-ton contraption. The Forevertron is made up of carbureters
and generators, early x-ray machines and theater speakers, river barges and
hamburger signs, to name just a few of its components. The end result is
important to Dr. Evermor. Possibly more important, however, is that each
historic piece speak for itself. His aim is to blend these objects while preserving
their individuality and unique form: "Rather than imposing one's will on



something that's already been created, you leave it alone and you just add or move another piece in as a blender that'll tie it from one to another... things that were of historic significance we leave alone." For example, the pair of late nineteenth-century bi-polar dynamos acquired from the Henry Ford Museum stand on their own while being seamlessly integrated into the Forevertron.



### La Pièce de Résistance

Of all the parts used to build the Forevertron, Dr. Evermor is especially proud of one:  the decontamination chamber from the Apollo Space Mission. He recounts the history of its salvage: "The Apollo decontamination chamber was in three trailers [donated to a university]. but wrecked and scrapped most of it, but I kept the two autoclaves that the moon rocks were passed through. We contacted NASA to try to get papers authenticating it, and boy—they're very touchy about what happened to that stuff. We did get the original drawings and it's the same damn thing."

The Forevertron is a masterfully crafted 300-ton sculpture made of recycled parts. Above thrusters and electromagnetic power sources sits a glass ball inside a copper egg which will serve as Dr. Evermor's space capsule. Peripheral parts include the Overlord Master Control, which functions as the electric hub and brain of the Forevertron. The Gravitron will shrink Dr. Evermor down in preparation for space travel. The Celestial Listening Ear allows Evermor to broadcast his observations from space to those back home.

### It's all in his Head

Possibly the most amazing thing about the Forevertron and other Dr. Evermor sculptures is there are no blueprints. The plans reside only in Dr. Evermor's brain: "No sketches, no models, no nothing. I just go for it." Many of these sculptures, like the Juicer Bug, for example, weigh more than 15 tons. The body of the Bug was hoisted onto spindly legs, a tricky proposition for even the most adept engineer. Dr. Evermor has learned to rely on his own calculations. As he says, "no engineering firm could compute the compression on these legs."

### Preserve the Past, Highball it to the Future

The Forevertron accomplishes several ends for the resourceful Dr. Evermor. On a historical level, it preserves the shapes, forms and mechanisms of the fast-disappearing industrial age. On a creative level, the Forevertron is nothing short of art. It is the world's largest and most visually balanced kinetic sculpture. And, on a purely practical level, the Forevertron will allow Dr. Evermor to achieve his dream. With his invention, on a magnetic lightning force field, he will highball himself to heaven—far from the "phoniness of this world."

An event like the Forevertron launch should not be missed and Dr. Evermor has designed his nineteenth-century theme park with the crowds in mind. For those who come to witness "history," Evermor promises a treat for the senses. Eyes will feast on the mass and grace of the Forevertron. Ears will take in the musical sounds of the 70-member bird band, whimsically delicate creatures made from brass bedposts, survey markers and gasoline nozzles. Taste buds will be treated to popcorn the old fashioned way, served from a turn-of-the-century popcorn stand. The Epicurean, a wheeled cart of Dr. Evermor's design, features a striped canopy, a chimney, enormous bellows and a barbecue pit six feet wide.

The Forevertron is located behind Delaney's Surplus, across the highway from the Badger Army Ammunition Factory on State Highway 12, seven miles south of Baraboo, Wisconsin and seven miles north of Prairie du Sac. It can be visited on Monday through Saturday from 9AM to 5PM and on Sunday from 12 to 5PM. Times subject to change.



The Forevertron and other sculptures created by Dr. Evermor from relics past can be visited Monday through Saturday, 9:00-5:00 p.m., Sunday 12:00-5:00 p.m. Times subject to change. If you visit on a warm spring day, you might even catch the pith-helmeted nineteenth-century Victorian inventor on the premises.

"I became Dr. Evermor around 1983 when we started to build the Forevertron. I was a bit upset with the world, not so much the economic conditions as the judicial system and things like that, and I wanted to perpetuate myself back into the heavens on this magnetic lightning force field."

---

**Off the Map** - A look into backyard paradises created by visionary artists around the world
Home | What is Visionary Art? | Tours | Travelogue | Create Paradise | Backyard Gallery | Classroom | Resources | Talkback
An Independent Lens / Electric Shadows Web-Exclusive Presentation

© 2014 Interactive Knowledge Inc.                                      Credits   Privacy Policy